# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Hillsborough Superior Court Northern District
300 Chestnut Street
Manchester NH 03101

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## SUMMONS IN A CIVIL ACTION



Case Name:     **State of New Hampshire v National Foam, Inc., et al**
Case Number:   **216-2019-CV-00446**

Date Complaint Filed: May 29, 2019
A Complaint has been filed against 3M Company; Buckeye Fire Equipment Company; Chemguard, Inc.; Chemours Company LLC; E.I. Du Pont De Nemours and Company; Kidde-Fenwal, Inc.; National Foam, Inc.; Tyco Fire Products LP in this Court. A copy of the Complaint is attached.

**The Court ORDERS that ON OR BEFORE:**

| | |
|---|---|
| July 18, 2019 | State of New Hampshire shall have this Summons and the attached Complaint served upon 3M Company; Buckeye Fire Equipment Company; Chemguard, Inc.; Chemours Company LLC; E.I. Du Pont De Nemours and Company; Kidde-Fenwal, Inc.; National Foam, Inc.; Tyco Fire Products LP by in hand or by leaving a copy at his/her abode, or by such other service as is allowed by law. |
| August 08, 2019 | State of New Hampshire shall electronically file the return(s) of service with this Court. Failure to do so may result in this action being dismissed without further notice. |
| 30 days after Defendant is served | 3M Company; Buckeye Fire Equipment Company; Chemguard, Inc.; Chemours Company LLC; E.I. Du Pont De Nemours and Company; Kidde-Fenwal, Inc.; National Foam, Inc.; Tyco Fire Products LP must electronically file an Appearance and Answer or other responsive pleading form with this Court. A copy of the Appearance and Answer or other responsive pleading must be sent electronically to the party/parties listed below. |

**Notice to 3M Company; Buckeye Fire Equipment Company; Chemguard, Inc.; Chemours Company LLC; E.I. Du Pont De Nemours and Company; Kidde-Fenwal, Inc.; National Foam, Inc.; Tyco Fire Products LP**: If you do not comply with these requirements you will be considered in default and the Court may issue orders that affect you without your input.

Send copies to:

| | |
|---|---|
| Christopher G. Aslin, ESQ | NH Attorney Generals Office - DOJ 33 Capitol Street Concord NH 03301-6397 |
| K. Allen Brooks, ESQ | NH Attorney Generals Office - DOJ 33 Capitol Street Concord NH 03301-6397 |
| National Foam, Inc. | 141 Junny Road Angier NC 27501 |
| E.I. Du Pont De Nemours and | 974 Centre Road Wilmington DE 19805 |

Company
3M Company
Tyco Fire Products LP
Chemours Company LLC
Chemguard, Inc.
Buckeye Fire Equipment
Company
Kidde-Fenwal, Inc.

3M Center St Paul MN  55144-1000
1400 Pennbrook Parkway Lansdale PA  19446
1007 Market Street Wilmington DE  19899
One Stanton Street Marinette WI  54143-2542
110 Kings Road Kings Mountain NC  28086

One Financial Plaza Hartford CT  06101

BY ORDER OF THE COURT

June 03, 2019

(126564)

W. Michael Scanlon
Clerk of Court

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Hillsborough Superior Court Northern District
300 Chestnut Street
Manchester NH 03101

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE TO DEFENDANT

Case Name:      **State of New Hampshire v National Foam, Inc., et al**
Case Number:    **216-2019-CV-00446**

You have been served with a Complaint which serves as notice that this legal action has been filed against you in the **Hillsborough Superior Court Northern District.** Review the Complaint to see the basis for the Plaintiff's claim.

Each Defendant is required to electronically file an Appearance and Answer 30 days after service. You may register and respond on any private or public computer. For your convenience, there is also a computer available in the courthouse lobby.

If you are working with an attorney, they will guide you on the next steps. If you are going to represent yourself in this action, go to the court's website: www.courts.state.nh.us, select the Electronic Services icon and then select the option for a self-represented party.

1.  Complete the registration/log in process. Click Register and follow the prompts.

2.  After you register, click Start Now. Select **Hillsborough Superior Court Northern District** as the location.

3.  Select "I am filing into an existing case". Enter **216-2019-CV-00446** and click Next.

4.  When you find the case, click on the link and follow the instructions on the screen. On the "What would you like to file?" screen, select "File a Response to Civil Complaint". Follow the instructions to complete your filing.

5.  Review your Response before submitting it to the court.

**IMPORTANT:** After receiving your response and other filings the court will send notifications and court orders electronically to the email address you provide.

A person who is filing or defending against a Civil Complaint will want to be familiar with the Rules of the Superior Court, which are available on the court's website: www.courts.state.nh.us.

Once you have registered and responded to the summons, you can access documents electronically filed by going to https://odypa.nhecourt.us/portal and following the instructions in the User Guide. In that process you will register, validate your email, request access and approval to view your case. After your information is validated by the court, you will be able to view case information and documents filed in your case.

If you have questions regarding this process, please contact the court at 1-855-212-1234.

NHJB-2678-Se (07/01/2018)

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                                      SUPERIOR COURT
NORTHERN DISTRICT                                                 216-2019-CV-00446
STATE OF NEW HAMPSHIRE,

Plaintiff,

vs.

3M COMPANY,
E. I. DU PONT DE NEMOURS AND COMPANY,
THE CHEMOURS COMPANY L.L.C.,
CHEMGUARD, INC.,
TYCO FIRE PRODUCTS LP,
BUCKEYE FIRE EQUIPMENT COMPANY;
KIDDE-FENWAL, INC; and
NATIONAL FOAM, INC.

Defendants.

## COMPLAINT

Plaintiff, the State of New Hampshire, as trustee of the State's surface and groundwater,

as steward of the State's fish, wildlife, and marine resources, and in its *parens patriae* capacity,

by and through the New Hampshire Attorney General, files this Complaint against the above-

named Defendants and alleges as follows:

### STATEMENT OF THE CASE

1.      The State brings this action in order to address contamination of the natural

resources of the State, including lands, waters, and wildlife, caused by fluorinated Class B

firefighting foam that is manufactured with the synthetic per- and polyfluoroalkyl substances

("PFAS") perfluorooctanesulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"),

perfluorononanoic acid ("PFNA") and/or perfluorohexanesulfonic acid ("PFHxS") and their

precursors.

2.      In this complaint, the term Aqueous Film-Forming Foam ("AFFF") is used to mean fluorinated Class B firefighting foam that contains PFOS, PFOA, PFNA and/or PFHxS (including all of their salts and ionic states as well as the acid forms of the molecules) and/or their chemical precursors.

3.      As used in this Complaint, the term "natural resources" includes the ocean and its tidal estuaries, wetlands, springs, streams, rivers, lakes, ponds, and other bodies of surface or ground water, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction, and further includes all land, fish, shellfish, wildlife, other biota and other such resources owned, managed, held in trust or otherwise preserved or protected by the State.

4.      The State is trustee of the surface waters and groundwaters located within or flowing through the boundaries of the State.

5.      The State is also the steward of fish, wildlife and marine resources within the State.

6.      The State owns certain lands in fee within the State, holds title to the beds of great ponds and tidal waters and holds easement interests in other lands to protect the conservation and natural resource values of the lands.

7.      The contamination of groundwater and surface water, fish, wildlife, marine resources, and other natural resources with PFOS, PFOA, PFNA and/or PFHxS from AFFF has damaged the value and use (including, but not limited to, beneficial and existence uses) of the State's natural resources.

8.      In addition, the State has a sovereign or a quasi-sovereign interest in the quality of surface and groundwater resources in the State as well as fish, wildlife, marine resources, and other natural resources in the State.

2

9.     The contamination of groundwater and surface water, fish, wildlife, marine

resources, and other natural resources with PFOS, PFOA, PFNA and/or PFHxS associated with

the use or disposal of AFFF has injured New Hampshire citizens throughout the State. As *parens*

*patriae* the State has an interest in ensuring that groundwater, surface water, fish, wildlife,

marine resources, and other natural resources can be safely used and enjoyed by its citizens and

that the health and well-being of its citizens is not harmed by such use.

10.     For instance, PFOS, PFOA, PFNA and/or PFHxS have impacted the State's

groundwater, surface water, fish, wildlife, marine resources, and other natural resources from the

use or storage of AFFF, or the maintenance of equipment used in the application of AFFF, at a

number of locations, including but not limited to: the Pease Air Force Base in Newington; the

New Hampshire State Fire Training Academy facility in Concord; the Rockingham County

Complex/Fire Training Facility in Brentwood; the Meadowood Fire Training Facility in

Fitzwilliam and Troy; the Kingston Fire Department; the New Boston Air Force Station Former

Fire Department; the Gilford Fire Training Center; the current and former locations of the

Windham Fire Department; and the Fletcher Mountain site in Goffstown.

11.     As such, the State can seek to remedy, and hereby does seek to remedy, these

injuries over which it has at least a quasi-sovereign interest in its capacity as *parens patriae*.

12.     Defendants in this action, 3M Company (f/k/a Minnesota Mining and

Manufacturing Company) ("3M"), Chemguard, Inc. ("Chemguard"), Tyco Fire Products LP

("Tyco"), Buckeye Fire Equipment Company ("Buckeye"); Kidde-Fenwal, Inc ("Kidde-

Fenwal"); and National Foam, Inc. ("National Foam"), are companies that manufactured AFFF

that entered into the stream of the State's commerce, were used by Federal, State, municipal and

other fire departments and agencies, businesses and other entities, and have contaminated the

3

State's land, waters, sediments, wildlife, marine resources, and other natural resources. Collectively 3M, Chemguard, Tyco, Buckeye, Kidde-Fenwal and National Foam are referred to as the "AFFF Defendants."

13.     Defendants E. I. du Pont de Nemours and Company ("Dupont") and The Chemours Company L.L.C. ("Chemours") manufacture, distribute and sell fluorosurfactants for use in the manufacture of AFFF by some or all of the AFFF Defendants.  Collectively DuPont and Chemours are referred to in this Complaint as "DuPont/Chemours."

14.     Defendants' manufacture, distribution, and sale of AFFF has caused, and continues to cause, widespread injury to the State's groundwater and surface water, fish, wildlife, marine resources, and other natural resources, as well as its citizens.

15.     Defendants knew or should have known that AFFF would cause injury to groundwater and surface water, fish, wildlife, marine resources, and other natural resources of the State, as well as its citizens.

16.     Defendants knew or should have known that PFOS, PFOA, PFNA and/or PFHxS in AFFF would be released into the environment.

17.     Defendants knew or should have known that such releases from the use or disposal of AFFF would injure the State's groundwater and surface water, fish, wildlife, marine resources, and other natural resources, thereby injuring public health and welfare, as has occurred and is continuing to occur within the State.

18.     Defendants knew or should have known that such releases from the use or disposal of AFFF would make groundwater and surface water unfit for drinking and potentially render certain biota such as fish and game unfit for consumption.

4

19.     Defendants knew or should have known that PFOS, PFOA, PFNA and/or PFHxS, when released into the environment from the use or disposal of AFFF, would bioaccumulate in people, biota and the food web in general and thereby threaten public health and welfare and the environment, as has occurred and is continuing to occur within the State as well as its citizens.

20.     The Defendants' products were defective in design in a manner that was unreasonably dangerous to users or consumers including the State and its citizens on whose behalf it acts as *parens patriae*.

21.     The defective products were sold by the Defendants who are in business of selling such products.

22.     The use of the products was reasonably foreseeable by the Defendants.

23.     The products caused injury to users or consumers including the State and its citizens on whose behalf it acts as *parens patriae*, or the property of users and consumers.

24.     The losses, damages and harms suffered by the State described herein would not have occurred but for the conduct of the Defendants, and the Defendants' conduct was a substantial factor in causing the losses, damages and harms.

25.     The Defendants failed to warn of the dangers of their products.

26.     Accordingly, the State is bringing this action to require Defendants to pay all of the costs, expenses, and damages associated with the Defendants' acts and omissions as alleged in this Complaint, including but not limited to such costs, expenses and damages for: (1) the investigation, remediation, cleanup, restoration, removal, treatment and monitoring related to the contamination of the State's groundwater and surface water, fish, wildlife, marine resources, and other natural resources; (2) the provision of potable drinking water where drinking water supplies have been or will be contaminated; (3) implementation of treatment technologies

5

necessary to eliminate further injury to soil, groundwater and surface water, sediment, fish, wildlife, marine resources, and other natural resources and to human health and the environment; (4) costs associated with safely and properly disposing of the Defendants' AFFF; (5) costs associated with the testing for and evaluation and treatment of contamination in public and private wells contaminated or potentially contaminated from the use or disposal of AFFF; and (6) all such other costs and expenses that have been or will be incurred as a result of the Defendants' acts or omissions as alleged in this Complaint.

27.     Finally, the State is also seeking from Defendants all damages to which the State is entitled to recover, including damages for injuries to groundwater and surface water, fish, wildlife, marine resources, and other natural resources and all other damages, costs, attorneys' fees and equitable relief to which it may be entitled.

### SCOPE OF THIS ACTION

28.     The State asserts the causes of action described in this Complaint in its capacity as sovereign, as trustee of public trust resources, as an owner of property or interests in property impacted by the Defendants' products, and pursuant to its authority to act as *parens patriae* as described above.

29.     Through this action, the State is not seeking damages, remediation, restoration or any other relief with respect to any contamination from PFOS, PFOA, PFNA and/or PFHxS that is not related to the manufacture and use of AFFF, as damages from those compounds that are not from the manufacture and use of AFFF are the subject of a separate action.

6

## THE PARTIES

30.     Plaintiff State of New Hampshire is represented by and through the Attorney General of the State of New Hampshire with principal offices at 33 Capitol Street, Concord, New Hampshire.

31.     Defendant 3M is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

32.     3M does business throughout the United States, including conducting business in New Hampshire, and is registered to do business in New Hampshire with the Secretary of State.

33.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, PA 19446.

34.     Tyco manufactures the Ansul brand of products and is the successor-in-interest to Ansul Company (collectively, "Tyco/Ansul").

35.     Tyco does business throughout the United States, including conducting business in New Hampshire.

36.     Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

37.     Chemguard does business throughout the United States, including conducting business in New Hampshire.

38.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110

7

Kings Road, Kings Mountain, North Carolina 28086.

39.     Buckeye does business throughout the United States, including conducting business in New Hampshire, and has been registered to do business in New Hampshire with the Secretary of State.

40.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101.

41.     Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").

42.     Kidde-Fenwal does business throughout the United States, including conducting business in New Hampshire.

43.     Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.

44.     National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire").

45.     National Foam/Angus Fire does and/or has done business throughout the United States, including conducting business in New Hampshire.

46.     Defendant DuPont is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

8

47.    DuPont does business throughout the United States, including conducting business in New Hampshire, and is registered to do business in New Hampshire with the Secretary of State.

48.    Defendant The Chemours Company L.L.C. ("Chemours") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

49.    In 2015, DuPont spun off its performance chemicals business to Chemours, along with certain environmental liabilities.

50.    Chemours does business throughout the United States, including conducting business in New Hampshire, and is registered to do business in New Hampshire with the Secretary of State.

## JURISDICTION AND VENUE

51.    This Court has jurisdiction over this matter pursuant to RSA 491:7.  Venue is proper in this Court because at least one of the sites that has been impacted by AFFF is located in Hillsborough County in Goffstown.

## AFFF AND THE PFAS COMPOUNDS

52.    PFAS are a family of chemical compounds containing fluorine and carbon atoms.

53.    PFAS have been used for decades in the manufacture of AFFF.

54.    AFFF is a fire suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, vehicle fires and chemical fires, and is routinely used to train firefighters and test firefighting equipment.

55.    The PFAS family of chemicals are entirely human-made and do not exist in nature.

9

56.     This Complaint brought by the State is for costs, damages, and natural resource damages caused by four PFAS compounds: PFOS, PFOA, PFNA and PFHxS and their precursors from the use of AFFF in New Hampshire that was manufactured by the Defendants.

57.     3M's AFFF products, created using an electrochemical fluorination ("ECF") process, contain PFOS, PFOA, PFNA and/or PFHxS and/or their precursors.

58.     The remaining AFFF Defendants' AFFF products contain PFOA, PFNA, their precursors and/or other non-perfluorosulfonate compounds created using a telomerization process or other processes.

59.     AFFF manufactured by the AFFF Defendants is a fungible product and lacks traits that would make it feasible to identify the product as being manufactured, distributed, or sold by a particular Defendant.

60.     Due to this fungibility, it may not be possible to identify the original manufacturer of the AFFF released at any particular site.

61.     Any inability of the State to identify the original manufacturer of the specific AFFF products released into the State's resources is a result of the fungibility of the products, and not as a result of any action or inaction by the State.

62.     When used as intended, AFFF will contaminate the environment in a variety of ways, including but not limited to, through surface water and groundwater, in relation to firefighting events, training exercises, fire preparations, equipment maintenance and other activities.

63.     PFOS, PFOA, PFNA and PFHxS have characteristics that cause extensive and persistent environmental contamination.

64.     Specifically, PFOS, PFOA, PFNA and PFHxS are persistent, toxic and

10

bioaccumulative as well as mobile.

65.    PFOS, PFOA, PFNA and PFHxS are mobile in that they are soluble and do not easily adsorb (stick) to soil particles.

66.    PFOS, PFOA, PFNA and PFHxS are readily transported through the air as well as the soil and into groundwater where they can migrate long distances.

67.    PFAS are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water or wastewater.

68.    PFOS, PFOA, PFNA and PFHxS are thermally, chemically, and biologically stable in the environment and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

69.    Once these PFAS compounds are applied, discharged, disposed of, or otherwise released onto land or into the air, soil, sediments or water, they migrate through the environment and into groundwater, surface water, fish, wildlife, marine resources, and other natural resources.

70.    These compounds resist natural degradation and are difficult and costly to remove from soil and water.

71.    PFOS, PFOA, PFNA and PFHxS bioaccumulate, biopersist, and biomagnify in the food web including in people and other organisms.

72.    Exposure to certain PFAS has been associated with several negative health outcomes in both humans and animals, including but not limited to:

       a.    Altered growth, learning and behavior of infants and older children;
       b.    Lowering a woman's chance of getting pregnant;
       c.    Interference with the body's natural hormones;
       d.    Increased cholesterol levels;
       e.    Modulation of the immune system;
       f.    Increased risk of certain cancers; and
       g.    Increased risk of ulcerative colitis.

73.    Contamination from PFOS, PFOA, PFNA and/or PFHxS presents a threat to

11

public health and natural resources.

74.    In addition to drinking contaminated water, humans can be exposed to PFOS, PFOA, PFNA and PFHxS through inhalation, ingestion of contaminated food, and dermal contact.

75.    The State currently does not have the funding or infrastructure to properly address PFAS contamination from the use or disposal of AFFF in New Hampshire.

76.    Defendants have known of health and environmental hazards associated with PFAS compounds for decades.

77.    The AFFF Defendants' manufacture, distribution and/or sale of AFFF resulted in the release of PFOS, PFOA, PFNA and/or PFHxS into the environment.

78.    The AFFF Defendants, through their manufacturing, distribution and/or sale of AFFF, and through their involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known and/or foreseen that PFOS, PFOA, PFNA and/or PFHxS would contaminate the environment.

79.    The AFFF Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw and/or should have foreseen that their marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use or disposal of AFFF, including in New Hampshire, would result in the contamination of the State's groundwater, surface water, fish, wildlife, marine resources, and other natural resources and real property.

80.    The AFFF Defendants' products were unreasonably dangerous and the Defendants failed to warn of this danger.

12

81.     DuPont/Chemours' manufacture, distribution and/or sale of fluorosurfactants used in the manufacture of AFFF resulted in the release of PFAS into the environment.

82.     DuPont/Chemours, through their manufacturing, distribution and/or sale of fluorosurfactants used in the manufacture of AFFF, and through their involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known and/or foreseen that PFAS would contaminate the environment.

83.     Dupont/Chemours were and/or should have been aware, knew and/or should have known, and/or foresaw and/or should have foreseen that their marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use or disposal of fluorosurfactants used in the manufacture of AFFF, including in New Hampshire, would result in the contamination of the State's groundwater, surface water, fish, wildlife, marine resources, and other natural resources and real property.

84.     The Defendants' products were unreasonably dangerous and the Defendants failed to warn of this danger.

### Defendants' History of Manufacturing and Selling AFFF

85.     3M began to produce PFAS by ECF in the 1940s.

86.     In the 1960s, 3M used its fluorination process to develop AFFF.

87.     3M manufactured, marketed, and sold AFFF and the raw materials for production of AFFF from the 1960s to the early 2000s.

88.     National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s.

89.     Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s.

13

90.     Buckeye began to manufacture, market, and sell AFFF in the 2000s.

91.     From the 1960s through 2001, the United States Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

92.     Beginning in 1951, DuPont began purchasing PFOA from 3M for use in the manufacturing process for its name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

93.     DuPont has also used PFAS in other name-brand products such as Stainmaster®.

94.     In 2000, 3M announced it would phase out and find substitutes for its PFOS chemistry.

95.     In 2001, DuPont became a founding member of the Fire Fighting Foam Coalition ("FFFC").

96.     In part, through its involvement in the FFFC, DuPont actively marketed its fluorosurfactants to AFFF manufacturers for use in the production of AFFF.

97.     Some or all of the AFFF manufactured and sold by the AFFF Defendants contained fluorosurfactants manufactured and sold by DuPont.

98.     In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

99.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

100.     On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment,

14

have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

101.    In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

102.    After 3M exited the AFFF market, the remaining AFFF Defendants continued to manufacture and sell AFFF.

103.    The AFFF Defendants knew their customers warehoused large stockpiles of AFFF and touted the shelf-life of AFFF.

104.    While the AFFF Defendants phased out production or transitioned to new formulas of AFFF, they did not instruct users of AFFF that they should not use AFFF that contained PFOS, PFOA, PFNA and/or PFHxS, and/or their precursors.

105.    The AFFF Defendants further did not act to remove AFFF from the stream of commerce.

106.    The AFFF Defendants did not warn public entities or others that AFFF would harm the environment, endanger human health, or cause them to incur substantial costs to investigate and clean up contamination of groundwater and other natural resources and to dispose of AFFF.

107.    Accordingly, for many years after the original sale of AFFF, these AFFF products were and are still being applied directly to the ground, discharged into floor drains and washed into sediments, soils and waters, harming the environment and endangering human health.

108.    The AFFF Defendants did not properly instruct users, consumers, public officials or those who were in a position to properly guard against the dangers of PFAS, that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

15

## 3M's KNOWLEDGE OF THE DANGERS OF PFAS

109.   In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

110.   3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

111.   By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

112.   3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

113.   As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

114.   3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

115.   3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

116.   By at least 1970, 3M was aware that its PFAS products were hazardous to marine life.

117.   One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

118.   In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

16

119.    Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.

120.    This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFOA in blood from 3M's products.

121.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

122.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.

123.    A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River.

124.    3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

125.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

126.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

127.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.

128.    3M's own employees recognized that 3M was concealing known dangers relating to PFAS.  For example, in a 1999 resignation letter, an employee stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is

17

unethical to be concerned with markets, legal defensibility and image over environmental safety."

129.     In response to pressure from the U.S. EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

130.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

131.     On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

132.     3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in New Hampshire.

133.     Despite overwhelming studies to the contrary, 3M, to this day, publicly claims that "[w]e do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS."

### DUPONT'S KNOWLEDGE OF THE DANGERS OF PFAS

134.     DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961.

135.     DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

18

136.    In 1978, based on information it received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.

137.    This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

138.    By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

139.    DuPont did not report this data or the results of its worker health analysis to any government agency or community.

140.    The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

141.    Not only did DuPont know that PFOA accumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

142.    In fact, DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed the results of internal studies of its own plant workers.

143.    While DuPont knew about this toxicity danger as early as the 1960s, DuPont also was aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.

144.    By late 1981, DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

19

145.    Further, no later than 1984, DuPont was aware that PFOA is biopersistent.

146.    DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.

147.    After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

148.    DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

149.    DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

150.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

151.    They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation."

152.    They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

153.    DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

154.    For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

155.    In 2004, the U.S. EPA filed an action against DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of federal environmental laws.

156.    DuPont eventually settled the action by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects.

157.    The U.S. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

158.    DuPont/Chemours knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in New Hampshire.

**OTHER DEFENDANTS' KNOWLEDGE OF THE DANGERS OF PFAS**

159.    Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire and National Foam/Angus Fire knew, or at the very least should have known, that in their intended and/or common use, their AFFF products would harm the environment and human health.

160.    Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire and National Foam/Angus Fire knew, or at the very least should have known that, their AFFF products would injure the State's groundwater and surface water, fish, wildlife, marine resources, and other natural resources.

161.    Information regarding PFAS compounds was readily accessible to each of the above-referenced Defendants for decades because each is an expert in the field of AFFF

21

manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

162.    The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.

163.    DuPont/Chemours, which as is described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC.

164.    All of the Defendants, with the exception of 3M, were members of the FFFC ("FFFC Defendants").

165.    Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA.

166.    The FFFC Defendants worked together to protect AFFF from scrutiny.

167.    Their close cooperation included messaging on PFOA's toxicological profile.

168.    The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFOA to human health and the environment.

169.    FFFC Defendants regularly published newsletters and attended conferences bolstering their AFFF products.

170.    These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF from the government and public.

171.    FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market. Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

22

172.   FFFC Defendants knew the use of their AFFF products presented a similar threat to human health and the environment.

173.   While this was known to FFFC Defendants, it was not fully understood by the users of AFFF, the public and regulators, including the State.

## DUPONT'S SPINOFF OF CHEMOURS

174.   In February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary.

175.   In July 2015, DuPont used Chemours to spin off its "performance chemicals" business line.

176.   At the time of the spinoff, the performance chemicals division consisted of DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

177.   Until the spinoff was complete, Chemours was a wholly-owned subsidiary of DuPont. Although Chemours had a separate board, the board was controlled by DuPont employees.

178.   Prior to the spinoff of Chemours, in 2005, DuPont agreed to pay $10.25 million to resolve eight counts brought by the United Stated Environmental Protection Agency ("EPA") alleging violations of the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA") concerning the toxicity of PFAS compounds.  At the time, it was the largest such penalty in history.

179.   DuPont also promised to phase out production and use of PFOA by 2015.

180.   Also in 2005, DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.

23

181.    Under the terms of the 2005 class action settlement, DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

182.    After 8 years, the C-8 Science Panel found several significant diseases, including cancer, linked to PFOA.

183.    Thereafter, more than 3,500 personal injury claims were filed in Ohio and West Virginia as part of the 2005 settlement that were consolidated into a multidistrict litigation court in Ohio (the "Ohio MDL").

184.    Juries in three bellwether trials returned multi-million dollar verdicts against DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their illnesses.

185.    Once the spinoff was complete, seven new members of the Chemours board were appointed, for an eight member board of directors of the new public company.

186.    The new independent board appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

187.    In addition to the transfer of assets, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours assumed are set forth in the non-public schedules.

188.    Within the publicly available information about the transfer is the fact that Chemours agreed to indemnify DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities

24

relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or
conduct of the [Performance Chemicals] Business at any time."

189.    Chemours agreed to indemnify DuPont against and assume for itself the
Performance Chemical Business's liabilities regardless of:  (i) when or where such liabilities
arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the
effective date of the spinoff; (iii) where or against whom such liabilities are asserted or
determined; (iv) whether arising from or alleged to arise from negligence, gross negligence,
recklessness, violation of law, fraud or misrepresentation by any member of the DuPont group or
the Chemours group; and (v) which entity is named in any action associated with any liability.

190.    Chemours agreed to indemnify DuPont from, and assume all, environmental
liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance
Chemicals Business.

191.    Such liabilities were deemed "primarily associated" if DuPont reasonably
determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

192.    Among the environmental liabilities assumed by Chemours was litigation over
benzene, a carcinogen released from some of DuPont's plants.

193.    In December 2015, a Texas jury awarded $8.4 million to a painter who developed
leukemia after using paints with benzene for years, with at least 27 more benzene cases pending
as of September 30, 2016.

194.    Chemours is also obligated to clean-up Pompton Lakes, New Jersey, where
DuPont manufactured explosives from 1902 to 1994, and where lead salts, mercury, volatile
organic compounds, explosive powders, chlorinated solvents, and detonated blasting caps still

25

contaminate groundwater and soil. Chemours' SEC filings estimate that the remediation, which began in 1985, may cost as much as $119 million to complete.

195.    Chemours also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

196.    In addition to the assumption of such liabilities, Chemours also provided broad indemnification to DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

197.    The effect of creation of Chemours was to segregate a large portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products.

198.    The consolidation of DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of DuPont's liability.

199.    As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

200.    On February 13, 2017, DuPont and Chemours, agreed to pay $671 million to resolve the Ohio MDL.

201.    Chemours also agreed to pay $25 million for future PFOA costs not covered by the settlement for each of the next five years (up to an additional $125 million).

202.    DuPont also agreed to cover additional amounts up to $25 million for five years.

203.    At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation

to be filed regarding DuPont's liability for damages and injuries from the manufacture of PFAS compounds and products that contain PFAS compounds.

## AFFECTED RESOURCES

204.    PFOS, PFOA, PFNA and/or PFHxS have been found in soil, groundwater, surface water, fish, wildlife, marine resources, and other natural resources in New Hampshire associated with the use or disposal of AFFF.

205.    As a result of contamination from the use or disposal of AFFF, the resources described above have been diminished in quality or have been rendered unfit for public trust purposes (*e.g.*, beneficial use such as drinking, swimming, and fishing, as well as existence value).

206.    New Hampshire citizens have been deprived of safe drinking water due to the presence of PFOS, PFOA, PFNA and/or PFHxS from Defendants' AFFF in the State's groundwater and surface waters.

207.    Groundwater, surface water, fish, wildlife, marine resources, and other natural resources also possess intrinsic (*i.e.*, inherent existence) values which have been injured by the presence of PFOS, PFOA, PFNA and/or PFHxS from Defendants' AFFF.

208.    New Hampshire has been deprived of the full use and enjoyment of its public trust resources, and the intrinsic value of its natural resources has been diminished, due to the presence of PFOS, PFOA, PFNA and/or PFHxS from the Defendants' AFFF.

209.    Defendants' acts or omissions have caused or contributed to these releases.

210.    Because of the Defendants' failure to disclose risks known to them or risks they should have known about, the risks associated with PFAS and AFFF containing PFAS were

27

unknown to the State or to users and consumers of AFFF, including the owners or operators of sites at which AFFF was used.

211. Because of the Defendants' failure to disclose risks known to them or risks they should have known about, the risks associated with PFAS were unknown to the users of AFFF, were unknown to the State, and were generally unknown to those other than the Defendants who could have effectively limited the damages described above.

212. The Defendants' products were unreasonably dangerous and the Defendants failed to warn of this danger.

213. In addition to existing remediation methods, new and expensive methods of remediation and treatment will be necessary to deal with the type and character of the contamination described above.

### Groundwater

214. Groundwater—that is, water that exists beneath the Earth's surface—is an extremely important natural resource for the people of New Hampshire.

215. Most of New Hampshire's drinking water, whether from public water systems or private wells, comes from groundwater sources.

216. Approximately 46% of New Hampshire's population obtains its drinking water from private wells.

217. Groundwater is also used to irrigate agricultural crops and to provide drinking water to animals raised for human consumption in New Hampshire.

218. Groundwater and the other natural resources of the State are unique resources that help sustain the State's economy.

219.    PFOS, PFOA, PFNA and/or PFHxS from the AFFF Defendants' AFFF have reached and adversely affected groundwater throughout New Hampshire.

### Surface Water

220.    Surface waters are a critical ecological resource of New Hampshire.  New Hampshire's surface water is a source of drinking water in the State.

221.    Approximately fifty surface water resources are used as sources of public drinking water in New Hampshire.

222.    Surface water is also used to irrigate agricultural crops and provide drinking water to animals raised for human consumption in New Hampshire.

223.    Surface water in New Hampshire is also used for other commercial and recreational purposes, such as swimming, fishing, and the harvest of marine resources.

224.    The tourism and recreation industries, which are vital to the State's economy, are dependent on clean water.

225.    Surface waters also provide commercial, recreational, aesthetic, and ecological value, including by supporting aquatic ecosystems, fish and marine resources, nearby communities and the citizens and visitors in the State.

226.    PFOS, PFOA, PFNA and/or PFHxS from the AFFF Defendants' AFFF have reached and adversely affected surface water in New Hampshire.

### Biota

227.    Biota, including the flora and fauna of the State, are critical ecological resources. New Hampshire is home to more than 400 endangered or threatened plant species and is home for more than 500 species of vertebrate animals.

29

228.    Several threatened and endangered raptor species have difficulty breeding because of the bioaccumulation of toxic compounds.

229.    PFOS has been detected in the eggs of loons in New Hampshire.

230.    It is the duty of the State, through its Fish and Game Commissioners, to be the stewards of the fish, wildlife, and marine resources of the state of New Hampshire.

231.    New Hampshire's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of the ecological infrastructure for cultural and economic activity in the State.

232.    Injuries to biota in New Hampshire negatively impact not only the individual species directly involved, but the capacity of the injured ecosystems to regenerate and sustain such life into the future.

233.    New Hampshire's fish, marine resources, and wild game provide a source of food, as well as a significant economic benefit to the State through hunting and fishing licensing.

234.    New Hampshire's wildlife and other natural resources provide significant economic benefits to the State through tourism and recreation.

235.    PFOS, PFOA, PFNA and PFHxS from the AFFF Defendants' AFFF have reached and adversely affected biota in New Hampshire.

### FIRST CAUSE OF ACTION
### NEGLIGENCE – AFFF DEFENDANTS

236.    The State repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

237.    The AFFF Defendants had a duty to the State to exercise due care in the design, manufacture, formulation, handling, control, disposal, promotion, marketing, distribution, sale,

testing, labeling, use, provision of product information and instructions for the use or disposal of AFFF.

238.    The AFFF Defendants breached their duty of care in that they negligently, carelessly, and/or recklessly designed, manufactured, formulated, handled, labeled, provided product information and/or instructions for use and disposal of, marketed, promoted, sold, supplied and/or otherwise distributed AFFF and directly and proximately caused PFOS, PFOA, PFNA and/or PFHxS and their precursors to contaminate the State's property and its groundwater, surface waters, fish, wildlife, marine resources and other natural resources thereby causing a threat to human health and the environment.

239.    The AFFF Defendants designed, manufactured, formulated, handled, labeled, provided product information and/or instructions for use and disposal of, marketed, promoted, sold, supplied and/or otherwise distributed AFFF to downstream handlers, federal, state, municipal and other fire departments, and other users of AFFF, when they knew, or should have known, that PFOS, PFOA, PFNA and/or PFHxS would:  (i) be released into the environment from the use or disposal of AFFF in the State; (ii) be released and contaminate the State's property and its groundwater, surface waters, fish, wildlife, marine resources and other natural resources; and (iii) threaten the health and welfare of the State's citizens.

240.    Despite their knowledge that contamination with PFOS, PFOA, PFNA and/or PFHxS from AFFF was the inevitable consequence of their conduct as alleged herein, the AFFF Defendants failed to provide reasonable warnings or special instructions, failed to take other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of AFFF in their product information and/or instructions for use.

31

241.    As a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the State and its citizens, which it represents *parens patriae*, have suffered monetary losses and damages in amounts to be proven at trial.

242.    The AFFF Defendants are jointly and severally liable for the damages described above.

**SECOND CAUSE OF ACTION**
**DEFECTIVE DESIGN – AFFF DEFENDANTS**

243.    The State repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

244.    For the reasons described above, the AFFF Defendants' AFFF were defectively designed and were thereby unreasonably dangerous to users and consumers and/or their property, and the environment, at the time the products left Defendants' control.

245.    The AFFF Defendants failed to inform users, consumers, intermediaries, the State, and any party that could have effectively reduced the risk of harm related to using AFFF, of the products' character and the care required to use and dispose of the products safely.

246.    At all times relevant to this action, the AFFF was used in a manner in which it was foreseeably intended to be used.

247.    As a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the State and its citizens, which it represents *parens patriae*, have suffered monetary losses and damages in amounts to be proven at trial.

248.    As a further direct and proximate result of the AFFF Defendants' conduct, the State, in its capacity as trustee over its surface waters and groundwater, fish, wildlife, and marine resources has suffered and continues to suffer damage from the AFFF Defendants' conduct and the presence of PFOS, PFOA, PFNA and PFHxS from the AFFF Defendants' AFFF in the

32

State's surface waters and groundwater, fish, wildlife, marine resources and other natural resources, including without limitation costs to assess, investigate, monitor, analyze, and remediate PFOS, PFOA, PFNA and PFHxS, to prevent PFOS, PFOA, PFNA and PFHxS from injuring additional public trust resources, and to restore or replace the State's impacted surface waters and groundwater, fish, wildlife, and marine resources whose use has been lost or degraded.

249.    The AFFF Defendants are strictly, jointly and severally liable for the damages described above.

### THIRD CAUSE OF ACTION
### FAILURE TO WARN – AFFF DEFENDANTS

250.    The State repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

251.    The AFFF Defendants represented, asserted, claimed and warranted that AFFF did not require any different or special handling or precautions.

252.    AFFF manufactured and/or supplied by the AFFF Defendants are defective and unreasonably dangerous products.

253.    The AFFF Defendants failed to provide adequate or effective warnings of the risks of AFFF to users, consumers, intermediaries, the State, and any party that could have effectively reduced the risk of harm related to using AFFF, of the products' character and the care required to use and dispose of the product safely.

254.    At all times relevant to this action, AFFF manufactured and/or supplied by the AFFF Defendants were used in a manner in which they were foreseeably intended to be used.

33

255.    As a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the State and its citizens which it represents *parens patriae* have suffered monetary losses and damages in amounts to be proven at trial.

256.    As a further direct and proximate result of the AFFF Defendants' conduct, the State, in its capacity as trustee over its surface waters and groundwater, fish, wildlife, and marine resources, has suffered and continues to suffer damage from the AFFF Defendants' conduct and the presence of PFOS, PFOA, PFNA and PFHxS from the AFFF Defendants' AFFF in the State's surface waters and groundwater, fish, wildlife, marine resources and other natural resources, including without limitation costs to assess, investigate, monitor, analyze, and remediate PFOS, PFOA, PFNA and PFHxS, to prevent PFOS, PFOA, PFNA and PFHxS from injuring additional public trust resources, and to restore or replace the State's impacted surface waters and groundwater, fish, wildlife, and marine resources whose use has been lost or degraded.

257.    The AFFF Defendants are strictly, jointly and severally liable for the damages described above.

## FOURTH CAUSE OF ACTION
### TRESPASS – AFFF DEFENDANTS

258.    The State repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

259.    The AFFF manufactured and/or supplied by the AFFF Defendants affecting the State's property and its groundwater, surface waters, fish, wildlife, marine resources and other natural resources constitutes a physical invasion of property without permission or license.

260.    The trespass of PFOS, PFOA, PFNA and/or PFHxS from the AFFF Defendants' AFFF alleged herein has varied over time and has not ceased.

34

261.   PFOS, PFOA, PFNA and/or PFHxS from AFFF manufactured and/or supplied by the AFFF Defendants continues to be located on or in the State's property and its groundwater, surface water, fish, wildlife, marine resources and other natural resources.

262.   The AFFF Defendants intended to manufacture AFFF that contains PFOS, PFOA, PFNA and/or PFHxS and the AFFF Defendants knew with substantial certainty that their acts would contaminate State's property and its surface waters and groundwater, fish, wildlife, marine resources and other natural resources.

263.   The AFFF Defendants are therefore liable for trespass and continued trespass.

264.   The State has not consented to and does not consent to the trespass alleged herein.

265.   The State brings this claim as the owner of property and interests in property, as well as in both its public trustee and *parens patriae* capacities.

266.   The State has a duty to protect and restore its natural resources and protect the health and comfort of its inhabitants.

267.   In its *parens patriae* capacity, the State may protect its quasi-sovereign interests, including the State's interest in the well-being of its populace, as well as the populace's interest in the integrity of the State's natural resources.

268.   Accordingly, the State is bringing this action for the invasion of its own and a substantial number of its residents' possessory interests in the State's resources.

269.   As long as the State's property and natural resources remain contaminated due to the AFFF Defendants' conduct, the trespass continues.

270.   As a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the State and its populace, which it represents *parens patriae*, have suffered monetary losses and damages in amounts to be proven at trial.

35

271.   As a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the State is further entitled to an order requiring the AFFF Defendants to abate their ongoing trespass and a further order requiring the AFFF Defendants to conduct such investigation, remediation, cleanup, restoration, removal, treatment and monitoring actions as are necessary to prevent further trespasses and damages to the State's property and groundwater, surface waters, fish, wildlife, marine resources and other natural resources.

272.   The AFFF Defendants are strictly, jointly and severally liable for the damages described above.

## FIFTH CAUSE OF ACTION
## PUBLIC TRUST DOCTRINE – AFFF DEFENDANTS

273.   The State repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

274.   The State is the trustee of a public trust, the corpus of which includes, but is not limited to, the State's surface waters, groundwater, fish, wildlife, and marine resources.

275.   As a direct and proximate result of the AFFF Defendants' conduct, as set out above, the State's surface waters and groundwater, fish, wildlife, marine resources and other natural resources have been contaminated and/or impaired by PFOS, PFOA, PFNA and/or PFHxS from AFFF supplied and/or manufactured by the AFFF Defendants, and their beneficial uses and very existence have been degraded or eliminated.

276.   As a further direct and proximate result of the AFFF Defendants' conduct, the State, in its capacity as trustee over its surface waters and groundwater, fish, wildlife, and marine resources, has suffered and continues to suffer damage from the AFFF Defendants' conduct and the presence of PFOS, PFOA, PFNA and PFHxS from the AFFF Defendants' AFFF in the State's surface waters and groundwater, fish, wildlife, and marine resources, including without

36

limitation costs to assess, investigate, monitor, analyze, and remediate PFOS, PFOA, PFNA and

PFHxS, to prevent PFOS, PFOA, PFNA and PFHxS from injuring additional public trust

resources, and to restore or replace the State's impacted surface waters and groundwater, fish,

wildlife, and marine resources whose use has been lost or degraded.

## SIXTH CAUSE OF ACTION
## DUPONT/CHEMOURS' LIABILITY FOR COUNTS 1-5

277.    The State repeats and restates the allegations set forth in all the previous

paragraphs of this Complaint as if fully set forth herein.

278.    The State asserts the same allegations and causes of action described above in

counts one through five against DuPont/Chemours to the extent that their manufacture and sale

of fluorosurfactants or the failure to disclose the risks and harms associated with the use of their

fluorosurfactants in the manufacture of AFFF resulted in damages to the State as described

herein.

## SEVENTH CAUSE OF ACTION
## FRAUDULENT TRANSFER (DUPONT AND CHEMOURS)

279.    The State repeats and restates the allegations set forth in all the previous

paragraphs of this Complaint as if fully set forth herein.

280.    The State seeks equitable and other relief pursuant to the Uniform Fraudulent

Transfer Act, RSA 545-A, against DuPont.

281.    As a result of the transfer of assets and liabilities described in this Complaint,

DuPont limited the availability of assets to cover judgements for all of the liability for damages

and injuries from the manufacture of PFAS compounds and products that contain PFAS

compounds.

37

282.    DuPont has (a) acted with actual intent to hinder, delay and defraud parties or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond his ability to pay as they became due.

283.    DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the State of New Hampshire that have been damaged as a result of the DuPont's actions described in this Complaint.

284.    It is primarily DuPont, rather than Chemours, that for decades used, marketed and sold PFAS compounds with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying and impacting the State's groundwater, surface water, fish, wildlife, marine resources, and other natural resources.

285.    At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture of PFAS compounds and products that contain PFAS compounds.

286.    DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that it would incur, debts beyond Chemours' ability to pay as they became due.

287.    At all times relevant to this action, Chemours has been insolvent because the claims, judgment and potential judgments against it exceed Chemours' ability to pay.

288.    Pursuant to RSA 545-A:7, the State seeks to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

289.    The State further reserves such other rights and remedies that may be available to it under RSA 547-A as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

**EIGHTH CAUSE OF ACTION**
**ENHANCED COMPENSATORY DAMAGES – ALL DEFENDANTS**

290.    The State repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

291.    The wrongful acts of Defendants as described herein were committed intentionally, wantonly, maliciously and/or oppressively.

292.    Accordingly, the State is entitled to enhanced compensatory damages awarded in each Count alleged in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, the State request that this Court enter judgment against Defendants as follows:

A.    Finding all Defendants liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's property and its groundwater, surface water, fish, wildlife, marine resources, and other natural resources so that such resources are restored to their original condition and are fit for their intended and natural uses, and for all damages to compensate the citizens of New Hampshire for the lost use and value of these resources during all times of injury caused by PFOS, PFOA, PFNA and/or PFHxS from the Defendants' AFFF and/or DuPont/Chemours' fluorosurfactants, and for such

39

orders as may be necessary to provide full relief to address risks to the State, including the costs associated with:

(1) the investigation, remediation, cleanup, restoration, removal, treatment and monitoring related to the contamination of the State's property and its groundwater and surface water, fish, wildlife, marine resources, and other natural resources;

(2) the provision of potable drinking water where drinking water supplies have been or will be contaminated;

(3) the implementation of treatment technologies necessary to eliminate further injury to soil, groundwater and surface water, sediment, fish, wildlife, marine resources, and other natural resources and to human health and the environment;

(4) the safe and proper disposal of AFFF;

(5) the testing for and evaluation and treatment of contamination in public and private wells and source water supplies contaminated, or potentially contaminated, from the use and disposal of AFFF; and

(6) all such other costs and expenses that have been or will be incurred as a result of the Defendants' acts or omissions as alleged in this Complaint.

B.      Ordering all Defendants to pay all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFOS, PFOA, PFNA and/or PFHxS contamination of the State's property and its groundwater, surface water, fish, wildlife, marine resources, and other natural resources from the Defendants' AFFF and/or DuPont/Chemours' fluorosurfactants;

C.      Ordering all Defendants to pay all damages in an amount at least equal to the full cost of restoring the State's property and its groundwater, surface water, fish, wildlife, marine resources, and other natural resources to their original condition prior to the PFOS, PFOA,

PFNA and/or PFHxS contamination from the Defendants' AFFF and/or DuPont/Chemours' fluorosurfactants;

D.    Ordering Defendants to pay all compensatory damages for the lost value (including lost use and existence value) of the State's property and its groundwater, surface water, fish, wildlife, marine resources, and other natural resources as a result of the PFOS, PFOA, PFNA and/or PFHxS contamination of such natural resources from the Defendants' AFFF and/or DuPont/Chemours' fluorosurfactants;

E.    Ordering all Defendants to pay all other damages sustained by the State in its public trustee and *parens patriae* capacities as a direct and proximate result of the Defendants' acts and omissions alleged herein;

F.    Ordering that the State is entitled to avoid the transfer of DuPont's liabilities to Chemours and put the State in the position it would have been had the transfer not occurred;

G.    Awarding the State enhanced compensatory damages in an amount to be determined at trial;

H.    Awarding the State its costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

I.    Awarding the State such other relief as this Court deems appropriate.


## DEMAND FOR JURY

The State seeks a trial by jury on all counts and requests for relief in this Complaint.


41

Respectfully submitted,

STATE OF NEW HAMPSHIRE

By its attorney,
GORDON J. MACDONALD
ATTORNEY GENERAL

Date:   May 29, 2019

By:  /s/ K. Allen Brooks
     K. Allen Brooks, Bar # 16424
     Senior Assistant Attorney General
     Christopher G. Aslin, Bar # 18285
     Senior Assistant Attorney General
     Environmental Protection Bureau
     New Hampshire Dept. of Justice
     33 Capitol Street
     Concord, NH 03301
     (603) 271-3679
     k.allen.brooks@doj.nh.gov
     christopher.aslin@doj.nh.gov

42

# Merrimack County Sheriff's Office
### SHERIFF SCOTT E. HILLIARD
333 Daniel Webster Hwy
Boscawen, NH 03303
Phone: 603-796-6600

3M COMPANY, INC.
10 FERRY ST   313
CONCORD, NH 03301

## AFFIDAVIT OF SERVICE

MERRIMACK, SS                                              7/2/19

I, DEPUTY GLENN E LARAMIE JR, on this date at **10:28** (a.m.) p.m.,
summoned the within named defendant 3M COMPANY INC as within commanded, by
leaving at the office of Registered Agent Corporation Service Company, 10
Ferry Street, Suite 313, Concord, said County and State of New Hampshire,
its true and lawful agent for service of process under and by virtue of
Chapter 293-A New Hampshire RSA, as amended, a true and attested copy of
this Summons and Complaint.

FEES

|         |         |
|---------|---------|
| Service | $25.00  |
| Postage | 1.00    |
| Travel  | 15.00   |
| TOTAL   | $41.00  |

DEPUTY GLENN E LARAMIE JR
Merrimack County Sheriff's Office

**A True Copy Attest**

Deputy Sheriff